UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

FINGAL E. JOHNSON,

    Plaintiff,

v.

BILL MARTIN, *et al.*,

    Defendants.

_____/

MICHAEL JENKINS, *et al.*,

    Plaintiffs,

v.

BILL MARTIN, *et al.*,

    Defendants.

_____/

Case No. 2:00-CV-75

Hon. Richard Alan Enslen

Case No. 1:01-CV-515

**OPINION**

This matter is before the Court on class Plaintiffs' Motion for Partial Summary Judgment. Also before the Court is Defendants' Motion to Dismiss or in the Alternative for Summary Judgment. The Court has reviewed the parties' exhaustive briefings and finds oral argument unnecessary. W.D. MICH. LCIVR 7.2(d).

**I.   BACKGROUND**

On March 28, 2000, Plaintiff Fingal E. Johnson filed his Complaint in this matter *in pro per*. Since then, the Court has witnessed nearly five and one half years of litigation and on April 25, 2003, this case was certified as a class action. A complete rendition of the entire factual background would

add needless complexity and confusion, and therefore, only facts relevant for today's discussion are summarized as follows.[1]

The dispute in this case arose when the Michigan Department of Corrections ("MDOC") classified the Melanic Islamic Palace of the Rising Sun and its incarcerated members ("Melanics") as a security threat group.[2] Because of their security status, MDOC ordered Melanics to renounce their membership or face a higher security classification. Pursuant to MDOC policy, prisoners designated as security threat group members are prohibited from possessing "documents, materials, symbols, colors or pictures of an identified [security threat group]." MDOC POLICY DIRECTIVE 04.04.113 (effective Dec. 12, 1996). As a result of the Melanic's designation, MDOC Deputy Director Dan Bolden issued a January 12, 2000 memorandum wherein he advised that:

> Each facility should get a current roster of Melanics. Prisoners should be given seven (7) business days to turn in [Melanic] literature and materials. In addition, they should have the opportunity to renounce their affiliation/change affiliation at the time of the interview. Picking up literature should be handled carefully (items like Qurans and Bibles should be left alone). Group worship materials such as the Melanic flag should be removed from the facility and disposed of with care to avoid a negative/violent response . . . .

As ordered, Melanics were then given seven business days to either deliver all Melanic materials to MDOC or dispose of it on their own. Melanic material was identified as anything evidencing Melanic membership (pictures, clothing, jewelry, flags, writings, *etc.*).

---

[1] An all-inclusive account can be assembled by review of this Court's Opinions dated March 20, 2001; April 29, 2002; September 27, 2002; January 27, 2003; April 25, 2003; and October 7, 2003.

[2] According to Plaintiffs, the Melanics are a religious sect significantly influenced by Islam and other spiritual philosophies. Purposefully nondescript, the Court will endeavor to describe the Melanics no further as the Court recognizes it wades in dangerous waters when attempting to depict another's faith with any sort of precision.

In January 2000, Melanics residing outside MDOC institutions began mailing Melanic writings to those incarcerated. MDOC rejected the mailings as violative of MDOC mail policy. MDOC POLICY DIRECTIVE 05.03.118 (effective July 19, 1999) (prohibiting mail "that is a threat to the security, good order, or discipline of the facility. . . ."). Of specific concern to Plaintiffs are five related Melanic writings (hereinafter "Melanic Literature") that they were ordered to relinquish and are now prohibited from possessing. Plaintiffs contend that Melanic Literature is essential to practicing their religion. On March 16, 2000, MDOC Administrative Assistant Julie Southwick wrote:

> Based upon correspondence with the Attorney General, it appears that MDOC facilities issued a "total ban" on Melanic literature. Even though we have withdrawn recognition of the Melanics as an organized religion, a total ban has been held contrary to case law. [referencing, *Murphy v. Miss. Dep't of Corr.*, 814 F.2d 1252 (8th Cir. 1987)] . . . . <u>Facilities must review each peace of literature before banning it to determine whether the particular item is a threat to security or the good order of the institution.</u>

(emphasis in original). Plaintiffs claim they have not had access to Melanic Literature since January 2000.

## II.     STANDARD OF REVIEW

Because Defendants' Motion to Dismiss has asked this Court to consider matters outside of the pleadings, the Court will construe Defendants' dismissal arguments, as well as their summary judgment arguments, under a summary judgment standard. FED. R. CIV. P. 12(b). Deciding a motion for summary judgment requires the Court to determine if there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(C). The Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file. *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The facts are to be considered in a light most favorable to the non-moving party, and ". . . all justifiable inferences are to be drawn in his favor." *Schaffer v. A.O. Smith Harvestore Prod.*, 74 F.3d 722, 727 (6th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted).

Once the movant satisfies his burden of demonstrating an absence of a genuine issue of material fact, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Kramer v. Bachan Aerospace Corp.*, 912 F.2d 151, 153-54 (6th Cir. 1990). The non-moving party may not rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting FED. R. CIV. P. 56(e)). It is the function of the Court to decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The question is "whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Id.* at 252. Since both parties have moved for summary judgment or for partial summary judgment, each will be accorded the status of movant and non-movant when applicable.

**III.   ANALYSIS**

Plaintiffs have brought these consolidated suits under Title 42 of the United States Code, sections 1983 and 2000cc-1, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.[3]  Section 1983, while needing no introduction, provides a cause of action to redress violations of federal law at the hands of state actors. Using

---

[3] Neither Plaintiffs nor Defendants have moved for summary judgment on Plaintiffs' equal protection claim in their instant Motions.

section 1983, Plaintiffs claim Defendants violated their First Amendment rights. Section 2000cc-1 of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") does not share the same celebrity. The Act provides in pertinent part that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden . . ." furthers "a compelling governmental interest" and is done so by the least restrictive means. As for Plaintiffs' constitutional claim, the Due Process Clause prohibits states from depriving any person of life, liberty, or property without due process of law. U.S. CONST. amend. XIV, § 1.

The parties, and prior Opinions of this Court, have distilled the Courts' focus today to whether a ban on Melanic Literature violates the First Amendment, Due Process Clause, or RLUIPA. However, before addressing this question the Court must pause to assess Defendants' asserted qualified immunity because the privilege invoked "is an *immunity from suit* rather than a mere defense to liability . . . ." *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)) (emphasis in original).

### A. First Amendment and Qualified Immunity

Plaintiffs claim that Defendants violated their First Amendment rights by confiscating all Melanic materials and banning incoming Melanic material by mail.[4] In other words, Plaintiffs claim Defendants totally banned Melanic material from MDOC institutions. Defendants contend the

---

[4] In a January 27, 2003 Opinion the Court observed that it did not have enough information regarding what Melanic materials were banned to decide on Defendants' entitlement to qualified immunity. The Court has since been sufficiently advised in the premises and is now prepared to make this decision.

deprivation of Melanic material was reasonable in light of security concerns and that they enjoy qualified immunity.[5]

Qualified immunity protects government officials from monetary liability unless they violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When determining if an officer is entitled to qualified immunity, the Sixth Circuit Court of Appeals endorses a three-part test. *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999). First, Plaintiffs have to show a violation of a constitutionally or statutorily protected right; second, they must be shown that the right was clearly established at the time such that a reasonable official would have understood his behavior violated that right; and third, Plaintiffs have to allege sufficient facts, and support the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights. *Scicluna v. Wells*, 345 F.3d 441, 445 (6th Cir. 2003).

On January 12, 2001, Plaintiffs enjoyed a constitutionally protected right to freely exercise their religion while incarcerated, *Cruz v. Beto*, 450 U.S. 319, 322 n.2 (1972), and, subject to limitation, receive mail. *Thornburgh v. Abbott*, 490 U.S. 401, 407-09 (1989). The more difficult question is whether this right was clearly established, or specifically, whether it was clearly a constitutional violation to totally ban all Melanic material in light of Plaintiffs' security threat group status.

When determining what behavior is clearly constitutionally proscribed, the Sixth Circuit has instructed that:

---

[5] Defendants also assert that Melanic materials were never totally banned; however, because the Court finds Defendants enjoy qualified immunity even if they did totally ban Melanic material, this point will be taken up in the Court's discussion of injunctive relief. *See* Section III, D1, *infra*.

> [A] district court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting. [A] mere handful of decisions of other circuit and district courts, which are admittedly novel, cannot form the basis for a clearly established constitutional right in this circuit.

*Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177-78 (6th Cir. 1988); *see also Fisher v. Harden*, 398 F.3d 837, 845-46 (6th Cir. 2005). Neither the parties nor the Court is aware of any controlling Sixth Circuit precedent prior to January 12, 2001, and consequently, Plaintiffs have pinned their hopes on *Murphy v. Miss. Dep't of Corr.*, 814 F.2d 1252 (8th Cir. 1987) and *Williams v. Brimeyer*, 116 F.3d 351, 353 (8th Cir. 1997), to defeat Defendants' qualified immunity.[6] In *Murphy* and *Williams*, the Eighth Circuit Court of Appeals held that a blanket denial of religious materials, even when such materials were also in violation of prison rules, was too broad a policy and ran afoul of the First Amendment. "A total ban on [prohibited religious] materials is more restrictive of prisoner First Amendment rights than necessary to maintain prison security." *Murphy*, 814 F.2d at 1257.

As in *Seiter*, this Court is unwilling to find that *Murphy* and *Williams* clearly established a constitutional violation in Plaintiffs' favor. Neither decision issued from the Sixth Circuit and:

> Unless the defendants in this case (all of whom are presumably non-lawyers) had a quite extraordinary familiarity with the contents of the Federal Reporter, it is difficult to see how [two] [] decision[s] of another circuit could reasonably be expected to have changed the defendants' perception of how the Constitution is understood in

---

[6] Plaintiffs' citation to *McCabe v. Arave*, 827 F.2d 634 (9th Cir. 1987) is unavailing as there was no total ban in that case. In *McCabe*, prisoners were limited but never completely prevented from possessing religious materials.

>this circuit. *Harlow v. Fitzgerald* teaches that if a qualified-immunity defense is to be defeated on the ground that the constitutional violation was obvious, the constitutional rights in question must have been "clearly established" and must have been the sort that a "reasonable person" would have known about. *Harlow*, 457 U.S. at 818. [Two] idiosyncratic opinions[s] from the court of appeals for another circuit w[ere] hardly sufficient to put the defendants on notice of where this circuit or the Supreme Court might come out on the issue in question.

*Davis v. Holly*, 835 F.2d 1175, 1182 (6th Cir. 1987). Furthermore, *Murphy* and *Williams* are readily distinguishable from Defendants' confiscation order as neither decision involved a security threat group within the prison on the same level as the case at bar. Thus, the Court finds that because it was not clearly established law that a total ban of Melanic material was constitutionally forbidden, Defendants are immune from suit in damages on Plaintiffs' First Amendment claim.

### B.  Due Process and Qualified Immunity

Plaintiffs also claim that Defendants violated their procedural due process rights when Defendants banned Melanic material without a hearing. Defendants contend that a hearing was not required before confiscating Melanic material and that Plaintiffs could have grieved this issue had they chose to.

The Supreme Court has "repeatedly held that prisons are not beyond the reach of the Constitution. No 'iron curtain' separates one from the other . . . and thus, [p]risoners may [] claim the protections of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974). Thus, it is clearly established that at a minimum, the Due Process Clause requires that prisoners receive notice and the opportunity to be heard before deprived of life, liberty, or property. *Id.*

In this case, Defendants gave Plaintiffs sufficient notice that MDOC was going to confiscate all Melanic material within seven business days; and furthermore, there was an ample opportunity

for an inmate to grieve that confiscation order because prisoners who remained in possession of Melanic materials were afforded contraband hearings. In fact, 80 such hearings were held and six inmates successfully proved that their Melanic materials were not contraband. Thus, contrary to Plaintiffs' assertion, Plaintiffs did receive the constitutionally required notice and opportunity to be heard before they were dispossessed of their property. Consequently, Plaintiffs have not shown that Defendants' behavior was objectively unreasonable under the Due Process Clause. *Scicluna*, 345 F.3d at 445 (citing *Williams*, 186 F.3d at 691). Therefore, Defendants are immune from suit in damages on Plaintiffs' due process claim.

      C.     **RLUIPA and Qualified Immunity**

Plaintiffs further claim that Defendants violated RLUIPA by confiscating all Melanic materials. On November 7, 2003, the Sixth Circuit Court of Appeals found RLUIPA violated the Establishment Clause and was unconstitutional. *Cutter v. Wilkinson*, 349 F.3d 257 (6th Cir. 2003). The Supreme Court granted *certiorari* on October 12, 2004, and this Court stayed decision of the parties' motions until the Supreme Court decided *Cutter*. On May 31, 2005, the Supreme Court issued its decision on the constitutionality of RLUIPA. *Cutter v. Wilkinson*, 125 S. Ct. 2113 (2005). In an opinion written by Justice Ginsburg, the Court held that RLUIPA was compatible with the Establishment Clause as it found RLUIPA alleviates exceptional government-created burdens on private religious exercise, adequately accounts for burdens on nonbeneficiaries, and is faith neutral. *Id.* at 2121.

Turning to Defendants' asserted qualified immunity in light of the Supreme Court's decision in *Cutter*, Defendants contend that the statutory framework controlling religious exercise within the prison setting was either not protected by an act of Congress or was not clearly established, and

therefore, they are entitled to qualified immunity. Congress has twice passed legislation aimed at reinforcing prisoners' religious freedoms. Congress first passed the Religious Freedom Restoration Act of 1993 ("RFRA") to prohibit government from substantially burdening a person's exercise of religion unless it demonstrates such burdens are in furtherance of a compelling governmental interest and are the least restrictive means to do so. 42 U.S.C. § 2000bb-1. On June 25, 1997, the Supreme Court found that in enacting RFRA, Congress had exceeded its remedial powers under the Fourteenth Amendment and invalidated RFRA. *City of Boerne v. Flores*, 521 U.S. 507, 532-36 (1997).

On September 22, 2000, Congress went back to the drawing board and passed RLUIPA. RLUIPA was specifically limited in scope to programs receiving federal funds or affecting commerce. 42 U.S.C. § 2000cc-1. Save for the inserted congressional limitations and stylistic changes, 42 U.S.C. § 2000cc-1 (RLUIPA) and 42 U.S.C. § 2000bb-1 (RFRA) are functional equivalents. Thus, between June 1997 and September 2000, the legislative landscape was devoid of any statutory guidance for prison administrators to evaluate a prisoner's religious needs.

As noted, Deputy Director Bolden issued his order to confiscate Melanic material on January 12, 2000, in the middle of the statutory gap. The Court finds that at the time of the confiscation order, Plaintiffs did not enjoy any statutory religious protection, and thus, Defendants are immune from suit in damages on Plaintiffs' RLUIPA claim. In addition, the Court finds its reasoning in section A of this Opinion duly applicable and would also entitle Defendants to qualified immunity.

    **D.    Injunctive Relief**

While Defendants enjoy qualified immunity from suit in damages, no such privilege exists for claims seeking declaratory or injunctive relief. *Flagner v. Wilkinson*, 241 F.3d 475, 484 (2001).

Plaintiffs Motion seeks a declaration that their rights were violated and injunctive relief prohibiting Defendants from totally banning Melanic Literature.[7] Therefore, the Court will address the merits of Plaintiffs' First Amendment, Due Process, and RLUIPA claims in equity.

### 1. First Amendment

Central to Plaintiffs' First Amendment claim is whether Defendants' ban on Melanic Literature is reasonably related to a legitimate penological objective within the meaning of *Turner v. Safley*, 482 U.S. 78, 88-89 (1987).[8] The Supreme Court has articulated a four-factor test to assure that "prison administrators . . . and not the courts . . . make the difficult judgments concerning institutional operations." *Id.* at 89 (citing *Jones v. North Carolina Prisoner's Union*, 433 U.S. 119, 128 (1977)). First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it. *Id.* (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). Second, the reviewing court is advised to consider whether there are "alternative means of exercising the right that remain open to the prison inmate." *Id.* at 90. Third, the impact of the accommodation that the "asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally" is also relevant. *Id.* Finally, the

---

[7] Plaintiffs have also sought an injunctive order requiring Defendants to replace seized Melanic materials and reimburse Plaintiffs for the cost of mailing Melanic materials out of MDOC institutions. The Court finds this relief is actually a compensatory damage award styled as injunctive relief and as discussed earlier, Defendants are immune from suit in damages. *Cf. Edelman v. Jordan*, 415 U.S. 651, 666 (1974) (when a defendant is immune from damages, merely labeling relief sought as "equitable" does not create an available injunctive remedy when effect of injunction is essentially a money judgment).

[8] The parties' motions overlap as to whether the confiscation order was reasonable and will therefore be considered as competing motions for summary judgment. *See Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

existence or absence of ready alternatives is evidence of the reasonableness of a prison regulation. *Id.*

After applying the *Turner* test to the facts of this case, it is apparent that no First Amendment violation may follow. First, the confiscation order bears a rational relationship to prison security. Several Melanics, though the exact number is controverted, were involved in a prison riot at MDOC's Chippewa Valley facility. Thereafter, Melanics were designated a security threat group. Defendants have articulated that Melanic Literature espouses violence, racism, and an alternate hierarchical order within the prison. The confiscation order clearly bears a rational relationship to Defendants' important security interests.

With regard to *Turner*'s second factor, Defendants contend that because Plaintiffs were allowed access to Bibles and Qurans and were allowed to practice individual rituals, alternate means of practicing the Melanic faith remained open. Plaintiffs have introduced expert testimony indicating that inmate access to Melanic Literature is essential to their faith. While this factor may tip in Plaintiffs' favor, the Court is mindful that it is to be "particularly conscious of the 'measure of judicial deference owed to corrections officials.'" *Id.* at 89 (citing *Pell v. Procunier*, 417 U.S. 817, 827 (1974)).

As for the third *Turner* factor, allowing Melanic material into MDOC institutions would have a negative impact on guards, other inmates, and prison resources as Melanic Literature advocates and embeds an alternate power structure within MDOC institutions that is detrimental to the working order and security of those institutions. Prisoners would be under the authority of two masters with undoubtedly contradictory orders. Plaintiffs have challenged Defendants' appraisal of such hierarchical organizations with expert testimony, suggesting that Defendants' concerns are

exaggerated. In light of *Turner*'s deferential posture, this Court will not supplant the experience and judgment of MDOC officials for the opinion of a retained penologist.

In line with the final *Turner* factor, Plaintiffs posit that because Melanic Literature was previously allowed in MDOC institutions, allowing its return will have a *de minimis* effect on Defendants' penological interest. Plaintiffs' supposition overlooks a critical aspect of the Melanics in that they are now a security threat group. MDOC officials would have to scrutinize each piece of Melanic Literature with greater detail, now being forewarned of Melanic Literature's proclivity for violence and racism. The Court has observed that Melanic Literature numbers in the hundreds of pages, most single-space type. Requiring MDOC officials to weed through Melanic Literature and excise prohibited materials would certainly not engender a *de minimis* effect.

On the balance, and especially in light of *Turner*, the Court finds that Defendants' confiscation order was reasonably related to their penological needs and will grant their motion for summary judgment on this ground. Conversely, Plaintiffs' motion will be denied.

## 2. Due Process[9]

As observed in section B, Plaintiffs were afforded notice and the opportunity to be heard before their Melanic materials were confiscated. It is clear to the Court that Plaintiffs have been accorded all the process they are due. *Wolff*, 418 U.S. at 555-56. Thus, the Court will grant Defendants' Motion and deny Plaintiffs' motion on this ground.

---

[9] The parties' motions overlap on Plaintiffs' due process claim and will therefore be considered as competing motions for summary judgment. *See Lansing Dairy*, 39 F.3d at 1347.

### 3. RLUIPA[10]

Apparently *Turner v. Safely* did not sit well with members of Congress as they worked to pass RFRA, and eventually RLUIPA, effectively overruling *Turner*. RLUIPA provides in pertinent part that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden . . ." furthers "*a compelling governmental interest*" and is done so "*by the least restrictive means*." 42 U.S.C. § 2000cc-1. (emphasis supplied). It is no longer sufficient for prison officials to show a reasonable relation between its regulation and penological interests.

Assuming without deciding that Defendants' security interest is compelling, less restrictive means exist to satisfy their penological interests. Section D1 of this Opinion evinces that MDOC officials can screen Melanic Literature to assure prohibited materials are prevented entry into MDOC institutions.[11] While this is just one example, it demonstrates that a total ban on Melanic Literature is not the least restrictive means available to assure prison security, and consequently, Defendants have not met their burden under 42 U.S.C. § 2000cc-1.

Thus, the Court will reluctantly grant Plaintiffs' motion and deny Defendants' motion as they relate to RLUIPA. Congress has taken the Supreme Court's fears in *Turner* and made them a reality. Courts are now "the primary arbiters of what constitutes the best solution to every administrative problem," as RLUIPA "'unnecessarily perpetuate[s] the involvement of the federal courts in affairs

---

[10] The parties' motions overlap on Plaintiffs' RLUIPA claim and will therefore be considered as competing motions for summary judgment. *See Lansing Dairy*, 39 F.3d at 1347.

[11] The Court recognizes its Opinion may appear somewhat schizophrenic in that section D1 appears contradictory to section D3. This is purely the result of the heightened burden imposed on Defendants by RLUIPA.

of prison administration.'" *Turner*, 482 U.S. at 89 (citing *Procunier v. Martinez*, 416 U.S. 396, 407 (1974)). RLUIPA obligates this Court to cast aside its doubts about the dubious role it will play in prison administration, and therefore, this will Court enjoin MDOC from totally banning Melanic Literature from its institutions.[12]

### E. Administrative Exhaustion

Defendants have reiterated through various filings, most recently their instant Motion, that Plaintiffs' failure to exhaust is fatal to their claims. In an April 29, 2002 Opinion, this Court found exhaustion was not required and has been presented nothing since then to upset that finding.

### F. Defendants' Dismissal Arguments as to Plaintiffs Jenkins and the Melanic Islamic Palace of the Rising Sun

As noted, Defendants have moved to dismiss this action based on evidence outside the pleadings, and therefore, the Court is guided by Rule 56 rather than Rule 12(b). *See* FED. R. CIV. P. 12(b). Defendants contend that Plaintiffs' Amended Complaint is devoid of any allegations applicable to Plaintiff Michael Jenkins and aver that he cannot demonstrate any facts supporting a cause of action. Defendants also contend that no facts support a claim in favor of Plaintiff Melanic Islamic Palace of the Rising Sun.[13]

Plaintiffs Jenkins and the Melanic Islamic Palace of the Rising Sun oppose dismissal and believe they have alleged facts that support a finding of associational standing on behalf of their

---

[12] The Court finds that an injunction preventing Defendants from totally banning Melanic materials is narrowly tailored, extends no further than necessary, and represents the least intrusive means necessary to correct Defendants' RLUIPA violation. 18 U.S.C. § 3626. The Court has also considered the potential adverse impact on prison security. *Id.*

[13] The Melanic Islamic Palace of the Rising Sun is also a non-profit religious corporation recognized by the state of Michigan and Plaintiff Jenkins is its president.

members. To assert associational standing, three prerequisites must be met: (1) the members of the association must otherwise have standing to sue; (2) the interests that the organization seeks to protect must be germane to the purpose of the organization; and (3) neither the claim asserted nor the requested relief necessitates the participation of the individual members of the lawsuit. *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *See also Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988). The Court finds that Plaintiffs Jenkins and the Melanic Islamic Palace of the Rising Sun have a sufficient standing to remain in this action. This is particularly true given the injunctive nature of this case that will inure to the benefit of Melanics actually injured. *Warth*, 422 U.S. at 515. Thus, the Court will deny Defendants' Motion concerning dismissal of Plaintiffs Jenkins and the Melanic Islamic Palace of the Rising Sun.

### IV. CONCLUSION

Therefore, the Court will grant Plaintiffs' Motion for Partial Summary Judgment as to their claim under RUILPA and deny the Motion in all other respects. The Court will further grant Defendants summary judgment as to qualified immunity and summary judgment as to Plaintiffs' due process claim. In all other respects, Defendants' Motion will be denied. An Order, Injunction and Partial Judgment consistent with Opinion shall be entered.

DATED in Kalamazoo, MI:
December 7, 2005

/s/ Richard Alan Enslen
RICHARD ALAN ENSLEN
SENIOR UNITED STATES DISTRICT JUDGE